## Case No. 18,262.

### CHARGE TO GRAND JURY—FUGITIVE SLAVE LAW.

#### [2 Blatchf. 559.] [1]

#### Circuit Court, N. D. New York.   Oct., 1851.

##### THE FUGITIVE SLAVE LAW.

1. So far as it respects an obstruction to the execution of legal process, or a forcible rescue of a fugitive from service, under the act of September 18, 1850 (9 Stat. 462), commonly called "The Fugitive Slave Law," the provisions of that act probably supersede those of the act of April 30, 1790 (1 Stat. 112), with one exception.

2. The provision in the 22d section of the act of 1790, for the case of assaulting, beating or wounding any federal officer, or other person duly authorized, while engaged in serving or executing any process, may apply as well to the execution of process under the act of 1850 as under any other act, the case not being specifically provided for in the act of 1850, and there being no necessary repugnancy between the two acts in this respect.

3. There is some doubt whether a circuit court has jurisdiction of the offences named in the 7th section of the act of 1850, as that act in terms limits cognizance of those offences to the district courts.

4. It may be a question whether the provision of the 11th section of the judiciary act of September 24, 1789 (1 Stat. 78), conferring on the circuit court concurrent jurisdiction with the district court of all crimes and offences cognizable therein, applies to jurisdiction subsequently conferred on the district court in as specific terms as that conferred by the act of 1850.

5. The provision of the 2d section of the act of August 8, 1846 (9 Stat. 72), by which the district court is authorized to remit to the circuit court any indictment pending in the district court, no doubt embraces the cases specified in the 7th section of the act of 1850.

6. The consequences of forcible resistance and obstruction to the execution of the act of 1850, considered.

At the commencement of the term, NELSON, Circuit Justice, in charging the grand jury, after instructing them upon the law applicable to the several cases that were to come before them, proceeded as follows:

The district attorney has called my attention to a crime recently committed in one of the most populous towns in the western part of this state—the case of the seizure and rescue of a fugitive slave out of the hands of a federal officer, by an unlawful assemblage of people, more or less armed, pending an examination before a magistrate in pursuance of an act of congress passed September 18, 1850 (9 Stat. 462). The crime, as alleged, was committed in the edge of the evening, in the midst of the local police and municipal authorities of a city of intelligence and character; and this, after threats and other unmistakable evidences of an intended rescue and crime had been given

out. The marshal, and all the authorities associated with him, and other persons coming to his aid and assistance, were overborne by the violence of the mob, and law and legal authority were trampled under foot. The case is one calling for grave and serious inquiry on the part of the public authorities. Neither time nor expense should be regarded in the investigation of the crime, and in bringing the guilty offenders to justice. In a case so serious, striking at the very foundation of a government of laws, and substituting in its place brute force and anarchy, the whole power of the government should be put into requisition to suppress the spirit of disorder and punish the guilty. No government is worth preserving that does not or cannot enforce obedience to its laws.

The 7th section of the act of 1850 makes it a misdemeanor, subject to fine and imprisonment—the fine not to exceed $1,000, and the imprisonment not to exceed six months—for any person knowingly to obstruct the arrest of a fugitive from service, or for any person to rescue or attempt to rescue the fugitive after the arrest is made, or to aid or abet or assist, directly or indirectly, in an escape or rescue. The punishment, according to this act, is by indictment and conviction before the district court of the United States for the district within which the offence is committed.

The 22d section of the act of congress passed April 30, 1790 (1 Stat. 117), also provides for the case of the obstruction of legal process in the hands of an officer of the federal government. The offence is punishable by a fine not exceeding $300, and imprisonment not exceeding twelve months. So far as it respects an obstruction to the execution of legal process, or a forcible rescue of the prisoner, under the fugitive slave act, the provisions of that act probably supersede those of the act of 1790, with one exception. The act of 1790 provides for the case of assaulting, beating or wounding any federal officer or other person duly authorized, while engaged in serving or executing any process. This case is not specifically provided for in the act of 1850, and may apply as well to an execution of process under that act as under any other act, there being no necessary repugnancy between the acts in this respect.

There is some doubt as to whether the circuit court of the United States has jurisdiction of an offence committed under this act of 1850, as the act in terms limits the cognizance of the offence to the district court. I have, therefore, advised the district attorney to present the cases before that court. The 11th section of the judiciary act of 1789 (1 Stat. 78) confers on the circuit court concurrent jurisdiction with the district court of all crimes and offences cognizable therein. But it may be a question whether this provision applies to jurisdiction subsequently conferred on the district court as specifically as that conferred by the act of 1850. There is a provision in a recent act of congress, by which the district court is authorized to adjourn or continue criminal cases pending therein to the circuit court, which, no doubt, embraces the cases in question. Act Aug. 8, 1846 (9 Stat. 72, § 2).

The forcible resistance to and obstruction of the law to which I have referred, involve something more than the simple defeat of the execution of an act of congress. The act of 1850 was passed to carry into effect an important provision of the constitution of the United States, which declares that "no person held to service or labor, in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due."

The state of New York, in full convention assembled, ratified and adopted the constitution of which this provision is a part, on the 26th of July, 1788, when she entered into the Union,

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

and thereby pledged the faith and honor of the people of the state to the observance and fulfilment of all its provisions and injunctions, and of all laws enacted by congress in pursuance thereof. The faith and honor of the state are involved, therefore, in the discharge of these duties and obligations, and, while these virtues are acknowledged by the people of the state, the constitution will be revered and obeyed, and, so far as she is concerned, the Union will be cherished and preserved. It is not to be believed that, in the comparatively short period, in the being of a nation, of sixty-three years, her sons have so far degenerated as to become recreant to the obligations of the government formed by their fathers and cemented by their blood, and under which they have enjoyed a degree of freedom and prosperity, and a share of all the social blessings flowing therefrom, that never before fell to the lot of the human race. Nor is it to be doubted that, when it is seen that there is a sentiment of treasonable opposition, in some parts of the state, against the government, organized and breaking out into open acts of resistance to the constitution and laws, they will awake to the danger, and put down, with a strong hand, this spirit of disunion, and vindicate the faith and honor of their fathers and the character of their state.

The question, whether this provision of the constitution is to be carried into execution in the spirit in which it was adopted, is not one that concerns New York alone. If that were all, the question could be settled among ourselves. But other states have an interest—fifteen of them, a deep and abiding interest—in its observance. The compact has been made with them and with their people, and, until they consent to release us from it, we are bound by it, by every faith and tie that can give sanction to an obligation. It is true, New York may possess the physical power to disregard her obligation, and set the constitution at naught, and abide the consequences. There are, I am sorry to say, acts upon her statute-books which, if carried out into practical effect, would have already accomplished it. But they have not been carried into effect, and I trust never will be. They are, fortunately, a dead letter. Before the people of New York, or of any other Northern state, make up their minds to disregard and disobey this provision of the constitution, they will, I doubt not, look well to the consequences. Common sense, as well as common prudence and wisdom, would dictate this.

As I have already said, the provision in question is a material part of the constitution—the fundamental law of the Union, framed by our fathers, and under which we live—so material and important, that any one conversant with the history of that instrument knows that without it the Union would never have been formed. Let any one or more of the Northern states, therefore, annul or utterly disregard it, setting the fundamental law, in this respect, at defiance, and be successful in maintaining such disregard and abandonment of duty, against the whole force and power of the general government, and a disruption of the Union is already accomplished. One or more members of the confederacy cannot annul a material part of the compact which they have entered into with the other states, because they have no interest in it, or even if it be against their interest, and, at the same time, claim an observance of the compact by others. There can be no such obligation on those others, legal or moral. It requires but common sense, and common honesty, to settle this. That other state or those other states, interested in the rejected and repudiated part, after an unavailing effort by the constituted authorities of the Union to enforce obedience, would have a right to regard the compact as at an end, and to withdraw from a confederacy of faithless associates. There are

two sides to the compact, and both must be observed, or neither.

These principles are fundamental. They lie at the foundation of all contracts and compacts entered into by parties, whether for government or any other purpose; and they exact nothing more than common honesty and good faith, in the observance of the duties and obligations of each.

Seeing, therefore, and properly appreciating these consequences, as the inevitable tendency and result of breaking and setting at naught a material part of the constitution, with what concern should every good citizen contemplate the act, and with what alacrity and spirit should he come up to its support and maintenance! What vast and momentous interests may depend upon his active and patriotic devotion in defence of the constitution and laws of his country!

No one need for a moment harbor the supposition or belief that the Northern states will not be held to a strict fulfilment of their constitutional obligations arising out of this clause of the compact. The people of fifteen states of the Union are deeply interested in its execution, and demand its observance. They have already determined that it must no longer be disregarded, and have appealed to their Northern brethren to come up to their constitutional duties and obligations and save the Union. Many of them have confidence that they will, and are at this moment, upon the strength of that confidence, maintaining a vigorous and manful struggle with their less confident brethren, in behalf of the Union. It requires but an honest and faithful discharge of these duties and obligations by the North, to cheer them on and crown their patriotic efforts with success. Let the great state of New York, therefore, not falter in her duty, nor prove recreant to her obligations, at this time and in this struggle. No state has a greater stake in the preservation of the Union; nor is there any one whose voice, for good or for evil, will be more powerfully felt throughout its limits.

Disorderly and turbulent men—the common disturbers of society—are found in every government; and occasional outbreaks against law and legal authority must be expected. They scarcely compromit the character of a people, when the violence is speedily suppressed and the guilty offenders are sternly punished. New York may thus redeem herself from the odium of suffering the constitution and laws of the Union to be trampled under foot, and from a just responsibility to the other members of the confederacy. She will thus vindicate herself from the bad example of having broken the compact; and other states will not, so far as her action is concerned, be released from their obligations. But, should she falter in this duty, and in redeeming her own plighted faith to the constitution, how can she expect to preserve the Union, or, that other states, deeply concerned in the observance of her obligations, will remain with her in the confederacy? It would be vain to expect it; and her conduct, in the case supposed, will have rendered her powerless in any attempt to coerce the association. Having broken the compact herself, and cast off her constitutional obligations, she will have rendered herself morally impotent to exact fidelity from others.

Any one conversant with the history of the times, and with the great issue now agitating the country, and in which the perpetuity of this Union is involved, cannot fail to have seen that the result is in the hands of the people of the Northern states. They must determine it, and the responsibility rests upon them. If they abide by the constitution—the whole and every part of it—all will be well. If they expect the Union to be saved, and to enjoy the blessings flowing from it, short of this, they will find themselves mistaken when it is too late.